IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2019 JAN 28  P 1: 20

| | |
|---|---|
| DOMINEQUE HAKIM MARCELLE RAY, <br><br> Plaintiff, <br><br> v. <br><br> JEFFERSON DUNN, Commissioner, Alabama Department of Corrections, <br><br> Defendant. | Case No. 2:19-CV-88-WKW-CSC <br><br> **CAPITAL CASE** <br> **EXECUTION SET FOR** <br> **FEBRUARY 7, 2019** |

## COMPLAINT

On February 7, 2019, Domineque Hakim Marcelle Ray, a devout Muslim, will be executed under conditions that substantially burden the exercise of his religious beliefs as protected by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq, and violate the First Amendment's Establishment Clause. Mr. Ray's requests for reasonable accommodation and waiver of laws and / or rules of general applicability concerning the presence of a Christian chaplain in the execution chamber and the absence of an imam in the execution chamber have been denied. Mr. Ray respectfully requests that this Court provide permanent injunctive relief ensuring that he is only executed in a manner that complies with the RLUIPA and does not substantially burden the exercise of his religious beliefs.

1

## JURISDICTION & VENUE

1. This is an action for declaratory and injunctive relief to redress the deprivation of rights secured to Mr. Ray under the RLUIPA, and the jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

2. Venue is appropriate in the Middle District of Alabama because Commissioner Dunn is being sued in his official capacity as the Commissioner of the Alabama Department of Corrections ("ADOC"), headquartered in Montgomery, Alabama, within the Middle District. 28 U.S.C. §§ 1391(b)(1) and (c)(2).

## PARTIES

3. Domineque Hakim Marcelle Ray is a citizen of the United States and resident of the State of Alabama, subject to execution by the State of Alabama pursuant to a state court judgment of conviction for capital murder.

4. Jefferson Dunn, Commissioner of the ADOC, is responsible for the development and implementation of the protocol and procedures governing the execution of death-sentenced inmates in the State of Alabama.

5. Only Commissioner Dunn has the authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced inmates in the State of Alabama.

## CASE OR CONTROVERSY

6. There is a real and justiciable case or controversy between the parties.

7. Commissioner Dunn has implemented and enforced practices, policies, and laws that infringe on Mr. Ray's rights under the RLUIPA and the First Amendment's Establishment Clause.

## ADMINISTRATIVE EXHAUSTION

8. Mr. Ray has no available administrative remedies, as "[t]he policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41." Ala. Code § 15-18-82.1(g).[1]

## FACTUAL ALLEGATIONS

9. Alabama executions are conducted at Holman Correctional Facility ("Holman"), outside of Atmore, Alabama. Ala. Code § 15-18-82(b).

10. Commissioner Dunn and the ADOC do not permit the public—including death-sentenced inmates—to know the contents of the execution protocol.

11. The presumptive executioner is the warden of Holman or a person designated by the warden. Ala. Code § 15-18-82.

12. The warden of Holman is Cynthia Stewart ("Warden Stewart").

13. Alabama executions occur on Thursdays.

14. Pursuant to ADOC practice and procedure, executions are scheduled to begin at 6 p.m. Central Time on the specified date.

---

[1] Further, as set forth below, Mr. Ray has requested accommodations and been denied.

15. On the Monday, Tuesday, Wednesday, and Thursday of the week of an execution, the death-sentenced inmate is permitted exclusive use of Holman's visitation yard,[2] and may see family, friends, attorneys, and spiritual advisors who have been placed on a preapproved list.

16. Pursuant to ADOC practice and procedure, all meetings in the visitation yard during the week of an execution are "contact" visits—that is, they take place without a barrier between the death-sentenced inmate and the visitors.

17. Pursuant to ADOC practice and procedure, a death-sentenced inmate is removed from the visitation yard at approximately 4:30 p.m. Central Time on the day of the execution.

18. Pursuant to ADOC practice and procedure, a death-sentenced inmate is not permitted to meet with legal counsel, friends, or family after being removed from the visitation yard at approximately 4:30 p.m. Central Time on the day of the execution.

19. Pursuant to ADOC practice and procedure, a death-sentenced inmate is permitted to meet with his or her spiritual advisor until shortly before the death-sentenced inmate is taken to the execution chamber.

20. Such meetings between the death-sentenced inmate and the spiritual advisor take place in the death watch cell, located adjacent to the execution chamber.

---

[2] Despite what its name implies, the visitation yard at Holman Correction Facility is indoors.

21. Pursuant to ADOC practice and procedure, a death-sentenced inmate's meeting with his or her spiritual advisor in the death watch cell is a contact visit.

22. Pursuant to ADOC practice and procedure, the prison chaplain is present in the execution chamber during the execution.

23. Alabama law does not require the presence of the prison chaplain at an execution. Ala. Code § 15-18-83(a) ("The following persons *may* be present at an execution and none other: . . . (5) The chaplain of Holman Prison.") (emphasis added).

24. For more than 10 years, the prison chaplain at executions in Alabama has been Chris Summers ("Chaplain Summers").

25. Chaplain Summers is a Christian (non-Catholic).

26. During an execution by lethal injection, the prison chaplain stands inside the execution chamber, facing the death-sentenced inmate, approximately four feet from the death-sentenced inmate's feet, to the inmate's left.

27. The death-sentenced inmate's designated execution witnesses—including a spiritual advisor—are located in a small room behind a large partially-opaque window to the inmate's left, outside the execution chamber.

28. As a result of the prison chaplain's location and the location of the inmate's witnesses, an inmate who wishes to look at his or her designated witnesses—including a spiritual advisor—will see the prison chaplain.

5

29. Once in the execution chamber, a death-sentenced inmate who wishes to have physical contact with a religious leader while making a final prayer may do so only with the prison chaplain.

30. On or about January 23, 2019, Mr. Ray met with Warden Stewart.

31. At the meeting with Warden Stewart, Mr. Ray requested three accommodations based on his religious beliefs and practices.

32. The first accommodation Mr. Ray requested was that an imam (his spiritual advisor) take the place of Chaplain Summers in the execution chamber during his execution.

33. Warden Stewart denied the first requested accommodation.

34. The second accommodation Mr. Ray requested was that Chaplain Summers not be present in the execution chamber during his execution.

35. Warden Stewart denied the second requested accommodation.

36. The third accommodation Mr. Ray requested was that no autopsy be performed on his body because it conflicted with his religious beliefs, insofar as Islam only permits autopsies in certain circumstances.

37. Warden Stewart told him she had no control over the third requested accommodation.

38. On or about January 23, 2019, Mr. Ray met with Chaplain Summers, and requested the same accommodations concerning the presence of an imam and that Chaplain Summers not be present in the execution chamber during his execution.

39. Chaplain Summers told Mr. Ray that his requests could not be honored due to ADOC policy.

40. When Mr. Ray asked both Chaplain Summers and Warden Stewart if he could see a copy of the policy concerning the presence of the chaplain in the execution chamber, he was told that he could not see it.

41. Mr. Ray has designated a spiritual advisor—an imam—to be a witness at his execution.

42. Mr. Ray has met with his imam, in a contact visit, as recently as January 25, 2019, and has another such visit scheduled for January 30, 2019.

43. The ADOC "receives Federal financial assistance" and is, therefore, subject to the RLUIPA. 42 U.S.C. § 2000cc-1(b)(1).

44. Mr. Ray is an institutionalized person under the RLIUPA.

## CLAIMS FOR RELIEF

45. The RLUIPA, in relevant part, provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1)   is in furtherance of a compelling governmental interest; and
>
> (2)   is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a); *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) ("RLUIPA provides greater protection [than the First Amendment]. RLUIPA's 'substantial burden' inquiry

7

asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise.").

46. The RLUIPA provides an "expansive protection for religious liberty," as evidenced by "Congress defin[ing] 'religious exercise' capaciously to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,'" and "mandat[ing] that this concept 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Holt*, 135 S. Ct. at 860 (quoting 42 U.S.C. §§ 2000cc-5(7)(A) & -3(g)).

## Claim One

### Excluding Mr. Ray's imam from the execution chamber at the time of his execution in favor of a Christian chaplain violates his rights under the RLIUPA.

47. Mr. Ray hereby incorporates paragraphs 1 through 46 in support of Claim One.

48. Commissioner Dunn's policy and procedure forbidding the presence of Mr. Ray's spiritual advisor in the death chamber in place of the prison chaplain substantially burdens Mr. Ray's religious exercise.

49. There is no compelling governmental interest in preventing a condemned inmate from having his or her spiritual advisor—who has been approved to have a contact visit with the condemned inmate in the death watch cell steps away from the execution

chamber and moments before the execution begins—from taking the place of the prison chaplain in the execution chamber.[3]

50. Being deprived of the physical presence of a spiritual advisor, when that spiritual advisor is otherwise available, in the moments before death imposes a substantial burden on the free exercise of Mr. Ray's religious beliefs.

51. Preventing Mr. Ray from having his spiritual advisor present in the execution chamber during his execution is not narrowly-tailored to achieve any compelling governmental interest.

## Claim Two

### Requiring the presence of a Christian chaplain in the execution chamber at the time of his execution, over Mr. Ray's religiously-based objection, violates his rights under the RLIUPA.

52. Mr. Ray hereby incorporates paragraphs 1 through 46 in support of Claim Two.

53. Commissioner Dunn's policy and procedure requiring the presence of the prison chaplain in the execution chamber over Mr. Ray's religiously-based objection violates the RLUIPA in that it substantially burdens his religious exercise.

---

[3] Mr. Ray need not establish or negate a compelling governmental interest or that the means selected are the least restrictive, as that burden rests on Commissioner Dunn. *Holt*, 135 S. Ct. at 42 U.S.C. § 2000cc-2(b) ("[T]he government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion" as to whether the challenged action "substantially burdens the plaintiff's exercise of religion."); *Holt*, 135 S. Ct. at 864 (Under "RLUIPA's rigorous standard," the institution "is require[d] . . . not merely to explain why it denied an exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest.").

54. Being compelled to be in the immediate physical presence of a prison chaplain—especially of a different religion—in the moments before death imposes a substantial burden on Mr. Ray's free exercise of religious beliefs.

55. There is no compelling governmental interest in having a prison chaplain present in the execution chamber during an execution over the religiously-based objection of the person being executed.

### Claim Three

**Requiring the presence of a Christian chaplain in the execution chamber at the time of Mr. Ray's execution violates the First Amendment's Establishment Clause.[4]**

56. Mr. Ray hereby incorporates paragraphs 1 through 40 in support of Claim Three.

57. "It is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 186 (2014) (citations omitted).[5]

58. Although there is no single "test" for determining whether an Establishment Clause violation has occurred, the Supreme Court "ha[s] often found it useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or

---

[4] This claim will be moot if Mr. Ray prevails on Claims One and / or Two.

[5] Mr. Ray is required to remain present in the execution chamber while Chaplain Summers is present. *See Galloway*, 572 U.S. at 590 ("This case can be distinguished from the conclusions and holding of *Lee v. Weisman*, 505 U.S. 577 [(1992)]. There the Court found that, in the context of a graduation where school authorities maintained close supervision over the conduct of the students and the substance of the ceremony, a religious invocation was coercive as to an objecting student.").

10

primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion." *Lynch v. Donnelly*, 465 U.S. 668, 679 (1984) (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).

59. Chaplain Summers' mandatory presence in the execution chamber can serve only one interest—an unconstitutional one—safeguarding the soul or spiritual health of the condemned inmate in the Christian (non-Catholic) belief system.

60. Chaplain Summers' mandatory presence in the execution chamber—as opposed to a non-chaplain ADOC employee—has the principle or primary effect of advancing Christian (non-Catholic) religion and inhibiting all other religions.

61. Chaplain Summers' mandatory presence in the execution chamber creates an excessive entanglement of government with religion.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Ray respectfully request that this Court grant the following relief:

1. Issue a declaratory judgment that Commissioner Dunn's acts, policies, practices, and procedures complained of herein violate Mr. Ray's rights under the RLUIPA;

2. Grant Mr. Ray a permanent injunction requiring Commissioner Dunn (and his successors and agents) to permit Mr. Ray to elect to have his spiritual advisor take the place of the prison chaplain in the execution chamber, subject to proper screening, training, and regulation;

3. Grant Mr. Ray a permanent injunction enjoining Commissioner Dunn (and his successors and agents) from requiring the presence of the prison chaplain in the execution chamber over his objection; and

4. Grant such other relief as this Court deems proper and just.

Respectfully submitted this 28th day of January, 2019.

SPENCER J. HAHN
OREGON BAR NO. 043027

JOHN ANTHONY PALOMBI
KENTUCKY BAR NO. 86784

ASSISTANT FEDERAL DEFENDERS
FEDERAL DEFENDERS FOR THE
 MIDDLE DISTRICT OF ALABAMA
817 SOUTH COURT STREET
MONTGOMERY, ALABAMA 36104
(334) 834-2099
Spencer_Hahn@fd.org
John_Palombi@fd.org

*Counsel for Mr. Ray*

12