IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| DOMINEQUE HAKIM MARCELLE RAY, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | CASE NO. 2:19-CV-88-WKW |
|  | ) | [WO] |
| JEFFERSON DUNN, Commissioner, Alabama Department of Corrections, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## **MEMORANDUM OPINION AND ORDER**

Domineque Hakim Marcelle Ray is set to be executed on February 7, 2019 — punishment for robbing, raping, and murdering fifteen-year-old Tiffany Harville. This case is not about whether Ray may be executed; other courts have affirmed his death sentence.[1] This case is instead about *when* the execution will take place, *who* will be inside the execution chamber, and *how* the execution will be carried out. To be specific, Ray seeks an eleventh-hour stay of his execution so that the court can resolve three issues. The first is whether Ray may have a private spiritual advisor

---

[1] *Ray v. State*, 809 So. 2d 875, 891 (Ala. Crim. App. 2001) (holding Ray's "convictions and his sentence of death are proper"), *cert. denied*, 809 So. 2d 891 (Ala. 2001), *cert. denied*, 534 U.S. 1142 (2002); *Ray v. State*, 80 So. 3d 965, 997 (Ala. Crim. App. 2011) (denying state post-conviction relief), *cert. denied*, 80 So. 3d 997 (Ala. 2011); *Ray v. Thomas*, No. 11-cv-543, 2013 WL 5423816, at *61 (S.D. Ala. Sept. 27, 2013) (denying petition for writ of habeas corpus), *aff'd sub nom.*, *Ray v. Ala. Dep't of Corr.*, 809 F.3d 1202 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 417 (2016), *reh'g denied*, 137 S. Ct. 844 (2017).

inside the execution chamber during his execution. The second is whether Ray may exclude a state chaplain from the execution chamber. The third is whether Ray may elect to be executed by nitrogen hypoxia instead of by lethal injection.

It is undeniably difficult for an inmate to show that he is entitled to a stay. Among other things, he must show a substantial likelihood of success on the merits and that a stay would not harm the public interest. *DeYoung v. Owens*, 646 F.3d 1319, 1324 (11th Cir. 2011). This bar is even higher when an inmate waits too long to request a stay. In fact, courts apply "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)).

Ray could have brought this case long before he did, and he has not overcome the resulting "strong equitable presumption" against a stay. Ray also fails to show that he has a substantial likelihood of success on the merits and that a stay would not harm the public interest. As a result, Ray is not entitled to a stay of execution. The court will enter a consent order requiring that the state prison chaplain not be in the execution chamber during Ray's execution. But the court will not order the State to let Ray's private spiritual advisor be in the execution chamber.[2] Nor will it order the

---

[2] Jefferson Dunn, Commissioner of the Alabama Department of Corrections, is technically the named defendant. But because Commissioner Dunn is being sued in his official capacity, the court refers to him as "the State."

State to execute Ray by nitrogen hypoxia.

## I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. The parties do not contest personal jurisdiction or venue.

## II.  BACKGROUND

**A.** **Ray is set to be executed for the 1995 murder of Tiffany Harville.**

In 1995, Ray robbed, raped, and murdered fifteen-year-old Tiffany Harville. He had previously murdered two teenaged brothers. He was convicted in Dallas County Circuit Court of both capital murder committed during first-degree rape and capital murder committed during first-degree robbery. The jury recommended a death sentence by a vote of eleven to one, and the judge sentenced Ray to death. The Alabama Court of Criminal Appeals affirmed on direct appeal. *Ray v. State*, 809 So. 2d 875, 891 (Ala. Crim. App. 2001), *cert. denied*, 809 So. 2d 891 (Ala. 2001), *cert. denied*, 534 U.S. 1142 (2002).

After his direct appeal, Ray collaterally attacked his conviction in state court. The Dallas County Circuit Court denied Ray's petition after a three-day evidentiary hearing. The Alabama Court of Criminal Appeals affirmed. *Ray v. State*, 80 So. 3d 965, 997 (Ala. Crim. App. 2011), *cert. denied*, 80 So. 3d 997 (Ala. 2011).

Ray then filed a federal habeas petition under 28 U.S.C. § 2254. The Southern District of Alabama denied Ray's petition in its entirety. *Ray v. Thomas*, No. 11-cv-

543, 2013 WL 5423816, at *61 (S.D. Ala. Sept. 27, 2013). It also denied a certificate of appealability, *id.*, and a motion to alter or amend the judgment, *Ray v. Thomas*, No. 11-cv-543, 2013 WL 5979757, at *9 (S.D. Ala. Nov. 12, 2013). The Eleventh Circuit affirmed. *Ray v. Ala. Dep't of Corr.*, 809 F.3d 1202, 1211 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 417 (2016), *reh'g denied*, 137 S. Ct. 844 (2017).

On November 6, 2018, the Supreme Court of Alabama set February 7, 2019, as Ray's execution date. *Ray v. Thomas*, No. 11-cv-543, Doc. # 50 (S.D. Ala. filed Nov. 6, 2018). He will be executed at the Holman Correctional Facility in Atmore, Alabama. *See* Ala. Code § 15-18-82(b).

**B.** **The State protocol for executions**

A death-row inmate in Alabama has religious rights during the days and hours approaching his execution. Executions are on Thursdays, starting at 6:00 p.m. An inmate may visit with family, friends, attorneys, and spiritual advisors of his choice on the Monday, Tuesday, and Wednesday before his execution. He may also visit with family, friends, attorneys, and spiritual advisors of his choice until 4:30 p.m. on the day of execution. These are all "contact visits," meaning no barrier is between the inmate and his guests.

When goodbyes are said at 4:30 p.m. on Thursday, the inmate is taken to a holding cell next to the death chamber. A private spiritual advisor may accompany the inmate to the holding cell to await the final walk to the chamber. But the State

4

does not let the private spiritual advisor accompany the inmate into the execution chamber itself. Instead, the advisor must stay a few feet behind the glass wall of the chamber, in the viewing area reserved for the inmate's family and friends. There is no contact between the inmate and those in the viewing area.

A state-employed chaplain is a member of the execution team and is usually in the death chamber during executions. The current chaplain is a Christian. The state has never allowed an inmate's private spiritual advisor to be inside the chamber during an execution, regardless of the private spiritual advisor's religious affiliation. (Doc. # 20, at 12.)

By default, an inmate "shall be executed by lethal injection." Ala. Code § 15-18-82.1(a). An inmate has "one opportunity to elect that his or her death sentence be executed by . . . nitrogen hypoxia." *Id.* § 15-18-82.1(b). But to be executed by nitrogen hypoxia, Ray had to request it in writing by July 1, 2018. *See id.* § 15-18-82.1(b)(2). He did not elect nitrogen hypoxia until January 29, 2019. (Doc. # 12, at 8, 17.) Because Ray made his election several months too late, the State denied his request.

## C. Ray filed this action ten days before his scheduled execution date.

Ray is a devout Muslim. According to his attorneys, he has been a Muslim since at least 2006. (Doc. # 10.) Ray has had contact visits with a Muslim spiritual advisor (an imam) during his incarceration, including a contact visit this week. (Doc.

# 1, at 7; Doc. # 12, at 7.)

Because Ray is Muslim, he objects to the presence of a Christian chaplain in the death chamber during his execution. The State agrees not to require its chaplain to be in the chamber. Ray, however, requests more accommodations than that. He wants his private spiritual advisor with him in the death chamber during the execution. He also wants to be executed by nitrogen hypoxia instead of by lethal injection. (Doc. # 1, at 8–12; Doc. # 12, at 14–15.) The State has denied both requests. Ray claims the State's denials substantially burden his religious exercise, that the State lacks a compelling interest, and that the State could further any interests it does have in a less-restrictive manner.

On January 28, 2019, Ray sued the State under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, and the Establishment Clause of First Amendment. (Doc. # 1.) He filed an Emergency Motion for Stay of Execution on the same day. (Doc. # 4.) On January 31, 2019, the State responded to Ray's initial complaint (Doc. # 11) and Ray filed an amended complaint (Doc. # 12). The court also held a hearing on January 31.

### III. DISCUSSION

Although the Supreme Court has held that a death-row inmate may challenge the constitutionality of execution methods through a civil rights action, a stay "is not available as a matter of right," even if execution is imminent. *Hill*, 547 U.S. at 584.

6

Rather, "a stay of execution is an equitable remedy," and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.*; *cf. Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983) ("Each delay, for its span, is a commutation of a death sentence to one of imprisonment."). Crime victims also "have an important interest in the timely enforcement of a sentence." *Hill*, 547 U.S. at 584.

A motion for a stay filed by a death-row inmate who challenges the method of his execution is treated the same as any other motion for a stay. Before a court may issue a stay, the inmate must show that: "(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." *DeYoung*, 646 F.3d at 1324 (quoting *Powell v. Thomas*, 641 F.3d 1255, 1257 (11th Cir. 2011)); *see Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005). The inmate must, "by a clear showing," carry the burden of persuasion on all four requirements. *Hill*, 547 U.S. at 584; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

Finally, when a motion for a stay of execution is filed on the eve of execution, "the extent to which the inmate has delayed unnecessarily in bringing the claim" must be considered. *Nelson*, 541 U.S. at 649; *see Grayson v. Allen*, 491 F.3d 1318, 1322 (11th Cir. 2007) ("The equitable principles at issue when inmates facing

7

imminent execution delay in raising their § 1983 method-of-execution challenges are equally applicable to requests for both stays and injunctive relief."). A "strong equitable presumption" applies "against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584 (quoting *Nelson*, 541 U.S. at 650); *see also Gomez v. U.S. Dist. Ct. for N. Dist. of Calif.*, 503 U.S. 653, 654 (1992) (per curiam) (noting the "last-minute nature of an application" or an "attempt at manipulation" of the judicial process may warrant the denial of a stay).[3]

Based on these principles, a stay of execution is not warranted. Ray is guilty of inexcusable delay, and he has not surmounted the "strong equitable presumption" against granting a stay. Moreover, Ray has not shown he has a substantial likelihood of success on the merits and that a stay would not harm the State's interests.

A. **Ray unduly delayed bringing this action.**

Ray has been a death-row inmate at Holman Correctional Facility since 1999. Since Ray has been confined at Holman for more than nineteen years, he reasonably should have learned that the State allows only members of the execution team, which

---

[3] This equitable presumption has been previously applied in § 1983 method-of-execution cases, but apparently it has not yet been applied in RLUIPA cases. That is irrelevant. Both § 1983 and RLUIPA are civil rights laws. In fact, § 1983 protects constitutional rights, while RULIPA protects a right arising out of the Constitution but amplified by Congress. If the equitable presumption applies when constitutional rights are on the line, surely it applies when statutory rights are at issue. The equitable presumption also arises from the nature of the relief sought. (He who seeks equity must do equity.) It does not matter *why* the inmate wants an stay of execution so much as *that* he wants a stay of execution.

previously has included a state-employed chaplain, inside the execution chamber. Indeed, it was the state-employed chaplain who facilitated Ray's involvement with an imam for spiritual advice regarding his impending execution. Assuming that Ray "has been a committed Muslim since at least 2006" (Doc. # 10, at 1), and it being clear that Ray has had the assistance of legal counsel since at least 2003. Ray has had ample opportunity in the past twelve years to seek a religious exemption, instead of waiting until the eleventh hour to do so.

Once the denial of his federal habeas petition became final in 2017, Ray knew (or should have known) that the execution clock had started ticking. Yet there is no indication that Ray took any action for over two years to ensure that the State would honor his desire for a private spiritual advisor to be in the execution chamber with him. On November 6, 2018, the Alabama Supreme Court set his execution date for February 7, 2019. Even then, Ray sat silent, doing nothing for more than two months, waiting until ten days prior to his execution before filing an action.

In short, Ray has been dilatory in filing this action. He has shown no just or equitable reason for his delay, which cuts against a stay of execution. His complaint came "too late to avoid the inevitable need for a stay of execution," so a stay is not granted. *Williams v. Allen*, 496 F.3d 1210, 1213 (11th Cir. 2007) (affirming denial of stay when inmate waited to sue until the State requested an execution date); *see also, e.g.*, *Grayson*, 491 F.3d at 1321, 1325 (affirming denial of stay when inmate

sued before execution date was set); *Henyard v. Secretary*, 543 F.3d 644, 647–49 (11th Cir. 2008) (affirming denial of stay when inmate waited months to sue).

**B.     Ray has not shown a substantial likelihood of success on the merits.**

Under RLUIPA, the State cannot substantially burden Ray's sincere religious exercise unless that burden is the least restrictive means of furthering a compelling governmental interest:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —
>
> (1)   is in furtherance of a compelling governmental interest; and
>
> (2)   is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

As the text of statute reveals, RLUIPA uses a burden-shifting framework. Ray bears the initial burden of proving that the State's policy imposes a substantial burden on religious exercise. The burden then shifts to the State to show that its policy furthers a compelling state interest and that the State cannot further its interest without burdening religious exercise. *Holt v. Hobbs*, 135 S. Ct. 853, 862–64 (2015).

But to obtain a stay of execution, Ray must establish that he has a substantial likelihood of prevailing on the merits of his RLUIPA claim. That means *Ray* must show that it is substantially likely that the State *cannot* justify its policies. In other

10

words, it is not enough for Ray to show the existence of a substantial burden; he must show it is substantially likely that the State would lose if this case went to trial. Ray has not done so for any of his claims.

1.   *Requiring the presence of a private spiritual advisor*

Under the State's policy, Ray cannot bring his private spiritual advisor with him into the execution chamber. Ray claims that RLUIPA entitles him to have a private spiritual advisor inside the execution chamber during his execution. But it is not substantially likely that Ray is correct.

First, Ray has only made a conclusory allegation that the State is imposing a substantial burden. Of course, RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). But to be a *substantial* burden, a policy "must place more than an inconvenience on religious exercise." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004.) The burden must be "akin to significant pressure which directly coerces" Ray into changing his behavior. *Id.* That is, it must "significantly hamper" his religious exercise. *Davila v. Gladden*, 777 F.3d 1198, 1205 (11th Cir. 2015) (cleaned up). Ray makes no serious attempt to explain why the State's policy imposes such a burden. He only vaguely complains of not "having his spiritual advisor present" with him during the execution. (Doc. # 12, at 12.) But the State has accommodated Ray's religious exercise by allowing unfettered spiritual

counseling until the moment Ray steps into the execution chamber.

Second, Ray has not shown that it is substantially likely that the State lacks a compelling interest or that the State could use a less-restrictive means of furthering its interest. The State has compelling interests "of the highest order" in maintaining the solemnity, safety, and security of Ray's execution. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). Indeed, the State has a "moral obligation to carry out executions with the degree of seriousness and respect that the state-administered termination of human life demands." *Jackson v. Danberg*, 594 F.3d 210, 230 (3d Cir. 2010). The right of a state to take the life of a citizen cannot be pegged as any ordinary power. It is extraordinary, simultaneously touching the philosophical underpinnings of corporate power over individuals and the metaphysical consequences of its exercise. Comparisons to the growth of beards in prison, or the use of sweat lodges for religious exercise, or the presence of public prayer (or not) at a football game are general at best, and necessarily weak. Those questions, while of the same *kind*, are of infinitely smaller *consequence.* When weighing the State's and inmate's interests, it is the scales of consequence, not the scales of kind, that must judge the interests.[4]

---

[4] To be sure, the mere incantation of a compelling interest by the State is not an automatic talisman to defeat the interest of an inmate. *Holt*, 135 S. Ct. at 863–64. But the court has carefully considered and balanced those interests; it has not deferred to the State.

Ray has not shown that it is substantially likely that the State could further its interest while allowing untrained, "free world" spiritual advisors be in the death chamber. Instead, based on the record, it appears there is no less-restrictive means of furthering the State's interests. The State's interests in solemnity, safety, and security are so strong that the State cannot permit even a slight chance of interference with an execution. Though a state chaplain is usually in the death chamber, he is also a trained member of the execution team. He has witnessed dozens of executions and trained on how to respond if something goes wrong. If the chaplain disobeys orders, he will face disciplinary action. (Doc. # 20, at 15–16.) In contrast, Ray's private spiritual advisor is untrained, inexperienced, and outside the State's control. Allowing a private spiritual advisor in the execution chamber would also *double* the number of people (other than members of the execution team) that the State would have to account for in the event of an emergency: the inmate *and* his private spiritual advisor. This not only burdens the State's interest, but it places Ray himself at risk. It is not substantially likely that a private spiritual advisor could overcome these obstacles in a way that did not harm the State's interests.[5] Ray has shown no authority otherwise.

---

[5] It would be impossible to overcome them in one week — yet another reason Ray should have brought this case earlier.

## 2. *Excluding the state chaplain*

In Claim Two of his complaint, Ray claims that it violates RLUIPA to require a Christian chaplain be inside the execution chamber during his execution. In Claim Three, Ray asserts that requiring the presence of a Christian chaplain in the chamber violates the Establishment Clause. (Doc. # 1, at 9–10; Doc. # 12, at 12–13.) Ray stated in both his original and amended complaint that Claim Three "will be moot if [he] prevails on Claims One and / *or* Two." (Doc. # 12, at 13 n.6 (emphasis added); *see also* Doc. # 1, at 10 n.4.)

The State, through counsel, has represented both in writing and in open court that it will "waive the presence of the Holman chaplain in the execution chamber," thus conceding Claim Two to Ray. (Doc. # 11, at 15; *see also* Doc. # 20, at 5–6.) By Ray's own admission, this concession moots Claim Three as well. When the State took Ray at his word and asserted that its concession mooted Claim Three, Ray resisted, arguing that because the state was free to resume requiring the chaplain's presence in the execution chamber, the voluntary cessation-exception to the mootness doctrine applies. (*See* Doc. # 13, at 2–3 (citing *Rich v. Secretary*, 716 F.3d 525, 532 (11th Cir. 2013).) But this case concerns a one-time event — Ray's execution — so there is no danger that the State will repeat its conduct with respect to Ray. And since Ray did not bring this case on behalf of anyone other than himself (*see* Doc. # 1, at 11–12; Doc. # 12, at 15), there remains no Establishment Clause

14

claim for the court to decide.[6]

### 3. *Nitrogen-hypoxia election*

Ray has not shown a substantial likelihood of success on the merits of his final claim. An amendment to Alabama Code § 15-18-82.1(b), effective June 1, 2018, allows a death-row inmate "one opportunity to elect" nitrogen hypoxia, as opposed to lethal injection, as the means of carrying out his death sentence. But that election has time limits. Ray knew that he must have submitted a written nitrogen-hypoxia election within thirty days of June 1, 2018. *See* Ala. Code 15-18-82.1(b)(2). Dozens of other death-row inmates at Holman did so. (Doc. # 12, at 8.)

Ray does not argue that his nitrogen-hypoxia election (which came on January 29, 2019, one day after this suit was filed) was timely. (Doc. # 20, at 34.) Instead, he claims the State's observance of the statutory time limit and its denial of his late election substantially burden his religious exercise. Ray's explanation for his tardiness is that when the nitrogen-hypoxia amendments came into effect, his religious beliefs prohibited him from electing how he would die. Making such an election, he says, would be like aiding in a suicide.[7] Now, "having consulted with

---

[6] There are no allegations supporting Ray's standing to bring an Establishment Clause claim independent of the alleged injury that is now moot — *i.e.*, a state chaplain's presence in Ray's execution chamber. *See, e.g.*, *Flast v. Cohen*, 392 U.S. 83, 102 (1968) (defining the narrow grounds for taxpayer standing in Establishment Clause challenges to government actions).

[7] Ray says the same reason led him to refuse to participate in a challenge to the lethal-injection protocol brought by other death-row inmates. Such a challenge to the execution method

15

an imam," he wishes to elect to die by nitrogen hypoxia, a request the State has denied. (Doc. # 12, at 9.)

Claim Four lacks any merit. RLUIPA requires Ray's beliefs to be sincere and for the exercise of those beliefs to be substantially burdened by state action. The State's denial of Ray's untimely election places no substantial burden on the exercise of his religious beliefs. The State has issued a valid death warrant against Ray. Whether his sentence is carried out by lethal injection or nitrogen hypoxia, there is no claim that either method violates Ray's religious beliefs. There is no "Hobson's choice where the only realistic possible course of action available to [Ray] trenches on sincere religious exercise." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.). The only claim is that the State's denial of Ray's belated request burdens the exercise of a *previously held* religious belief — a belief that Ray apparently does not hold anymore, as shown by the fact he is now trying to make an election.[8]

In the end, the State's denial is only a burden to Ray because Ray's *previous* religious views kept him from acting on his *personal preference* that he be executed

---

requires the plaintiff to plead an alternative method of execution. *See generally Glossip v. Gross*, 135 S. Ct. 2726 (2015).

[8] Ray's written "Election Concerning Method of Execution" says he made his untimely election "under duress and by force due to my impending execution." (Doc. # 12, at 17.) That is an admission that his change of heart is hardly motivated by a sincere religious belief.

16

by nitrogen hypoxia — a preference he does not claim is grounded in any religious belief. While Ray has a right to be free from unjustified burdens on his religious exercise, he has no right to his preferred execution method — at least not without a timely election under Alabama law.[9] Because Ray does not claim that the State's denial of his untimely nitrogen-hypoxia election burdens any religious beliefs he currently holds, and because he does not claim either execution method offends his religious beliefs, Ray has not shown a substantial likelihood of the merits on Claim Four.

C.   **Irreparable Injury**

If the stay of execution is denied, Ray's execution will occur as scheduled. Note, however, that the fact that Ray will die by execution is not itself a cognizable constitutional injury. *See Baze v. Rees*, 553 U.S. 35, 47 (2008) (noting the "settled" principle "that capital punishment is constitutional").

D.   **Relative Harms to the Parties and the Public Interest**

The State has a "significant interest in meting out a sentence of death in a timely fashion." *Nelson*, 541 U.S. at 650. Crime victims also have an interest in the timely enforcement of a sentence. *Hill*, 547 U.S. at 584. To be sure, Alabama has an interest in protecting the freedom of religion. *See, e.g.*, Ala. Const. art. I, § 3.01

---

[9] A change in method of execution at this late hour is also likely to disrupt the process of preparing for Ray's execution and require a stay of execution.

(Alabama Religious Freedom Amendment). But Ray has not shown a substantial likelihood of success on the merits of his religious objections. To inhibit the interest in finality without a showing of a substantial likelihood of success would do strong injustice to the "powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Thus, the balance of harms and the public interest weigh against a stay of execution.

## IV. CONCLUSION

Under these circumstances, it is ORDERED that:

1. Commissioner Jefferson Dunn shall ensure that the chaplain of the Holman Correctional Facility is not present in the execution chamber during Ray's execution. Commissioner Dunn shall also ensure that the chaplain cannot be seen by Ray during the execution.

2. Ray's motion for appointment of counsel (Doc. # 3) is GRANTED.

3. Ray's emergency motion to stay execution (Doc. # 4) is DENIED.

4. Claims Two and Three of Ray's complaint are DISMISSED.

5. There being no just reason for delay, this Order is final and appealable as to claims resolved and injunctive relief denied. Fed. R. Civ. P. 54(b).

DONE this 1st day of February, 2019.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE